IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

TANISHA L. NELSON,

          Plaintiff,

    Vs.                              No. 12-2022-SAC

MICHAEL J. ASTURE,
Commissioner of Social Security,

          Defendant.


MEMORANDUM AND ORDER

      This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the claimant Tanisha L. Nelson's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* With the administrative record (Dk. 10) and the parties' briefs on file pursuant to D. Kan. Rule 83.7.1 (Dks. 13, 18 and 19), the case is ripe for review and decision.

**STANDARD OF REVIEW**

      The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." The court also reviews "whether the correct legal standards were applied." *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Persales*,

402 U.S. 389, 401 (1971) (quotation and citation omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The review for substantial evidence "must be based upon the record taken as a whole" while keeping in mind "evidence is not substantial if it is overwhelmed by other evidence in the record." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citations omitted). In its review of "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, . . . [the court] will not reweigh the evidence or substitute . . . [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted).

The court's duty to assess whether substantial evidence exists: "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.'" *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (quoting *Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir. 1985)). At the same time, the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d at 1084 (internal quotation marks and citation omitted). The court will "meticulously examine the record as a whole, including anything that may

undercut or detract from the ALJ's findings in order to determine if the substantiality test has been made." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted).

By statute, a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The first step entails determining whether the "claimant is presently engaged in substantial gainful activity." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted). The second step requires the claimant to show he suffers from a "severe impairment," that is, any "impairment or combination of impairments which limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (internal quotation marks and regulatory citations omitted). At step three, the claimant is to show his impairment is equivalent in severity to a listed impairment. *Lax*,

489 F.3d at 1084. "If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work." *Id*. Should the claimant meet his burden at step four, the Commissioner then assumes the burden at step five of showing "that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy" considering the claimant's age, education, and work experience. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010) (internal quotation marks and citation omitted). Substantial evidence must support the Commissioner's showing at step five. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). The evaluation at steps four and five makes use of the agency's RFC assessment. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).

**PROCEDURAL HISTORY**

After a hearing at which Tanisha Nelson was represented by counsel, the administrative law judge ("ALJ") issued her decision on June 9, 2010. (R. 10-20). At step one, the ALJ found that Nelson had not engaged in substantial gainful activity since October 2, 2007, the date of her application for benefits. (R.12) At step two, the ALJ found Nelson to have the following severe impairments: "adjustment disorder, cannabis dependence, and personality disorder." (R. 12). The ALJ found at step three that Nelson's

4

impairments did not meet or equal a listed impairment. (R. 12-14). At step four, the ALJ determined that Nelson had the RFC "to perform light work as defined in 20 CFR 416.967(b) except she cannot use ladders, ropes, scaffolds, or foot controls on the right. She cannot work with dangerous unprotected machinery, or vibrating tools; at unprotected heights; can occasionally use stairs, kneel, crouch, crawl and stoop; and can perform simple, unskilled work with a SVP of 1 or 2." (R.14). At step four, the ALJ concluded that Nelson "is capable of performing past relevant work as a housekeeper, packer, and door-to-door sales person." (R. 18). Therefore, the ALJ concluded the plaintiff was not disabled since October 7, 2001. (R. 20).

**FACTUAL BACKGROUND**

Born in December of 1981, Nelson was 25 on her onset date and 28 at her administrative hearing in April of 2010. She obtained her high school diploma through Job Corps and later graduated from Wright Business School in 2006 as a medical assistant. (R. 325). Nelson lives in an apartment and is the single parent of a six-year old daughter. She testified that her last job was through a temporary employment service inspecting medical equipment, and before that job, she worked in a warehouse packaging items for an ink recycling company. Nelson mentioned earlier jobs involving the packaging of medical equipment, housekeeping, and door-to-door sales. Nelson testified she stopped working in October of 2007 when her doctor took her off work.

5

In July of 2007, Nelson went to KU Medical Center ("KUMC") for complaints of hip pain and weakness. The notes indicate Nelson came in June for right leg pain and was prescribed medications which she did not have filled. (R. 260). On August 21, 2007, Nelson was seen by Saud Kahn, M.D. in KUMC's Neurology Department for complaints of low back pain and right leg pain. Dr. Kahn's impression was to evaluate the right leg numbness and tingling, as the "patient denies any history of any other problems." (R. 254). He recorded that the "examination is within normal limit" and that the Nelson's mental status was "awake, alert, oriented to time, place and person. Speech is spontaneous. Comprehension, repetition and fluency intact." *Id.* The results of the recommended MRI on the lumbar spine were "unremarkable." (R. 283). On August 28, 2007, she received a physical therapy evaluation at KUMC for this right leg pain. Nelson went to the first two therapy sessions and then did not return for her next two sessions. The therapist discharged Nelson for non-compliance on October 26, 2007. (R. 284).

Nelson is seen in December of 2007 by her treating physician Patricia Fitzgibbons, M.D., at KUMC's Department of Family Medicine, for complaints of abdominal and back pain. She was given pain medication through an injection, and her back pain subsided. It was noted that Nelson was "asking for disability papers to be filled out." (R. 308). Fitzgibbons observed "no depression, anxiety or agitation." (R. 310).

6

Nelson was seen by Elena Sidorenko, M.D., in January of 2008 for her abdominal pain. This was a referral by Dr. Fitzgibbons. Dr. Sidorenko's impression was "irritable bowel syndrome predominated by constipation" but she wanted to run additional tests to rule out hypothyroidism and celiac disease. (R. 432). Dr. Sidorenko's recorded review of symptoms with Nelson included: "weight gain, fatigue, weakness, increased daytime sleepiness, decreased physical endurance, . . ., numbness and tingling sensation, muscle weakness, occasional joint stiffness, joint pain, muscle pain, difficulty walking, feeling depressed and recurrent skin infections." (R. 433). The results of an endoscopy done in February 2008 showed a gastroesophageal reflux disease with a recommendation to continue the Prevacid. (R. 427).

In February of 2008, Disability Determination Services ("DDS") referred Nelson to Lynn Lieberman, Ph. D., for a consultative examination and cognitive testing based on Nelson's recent complaints of depression. (R. 324). Dr. Lieberman summarized:

> The claimant reported feeling depressed secondary to body aches and joint pain for which she participates in physical therapy. Although the claimant reported being depressed, she evidenced anger regarding reported attempt of her mother to have her admitted to a psychiatric hospital in 2006, and she refuted desire for or need for psychotropic medications to treat her alleged depression. Vegetative symptoms of depression included poor appetite and sleep, and tearfulness which she evidenced at times during the present evaluation. . . .
> The claimant's affect was variable, and not mood-congruent. Her thoughts were well organized, and with no indication of delusions . . . .
> The claimant is presently being diagnosed with Post-traumatic Stress Disorder and Personality, with rule-out of Schizophreniform Disorder.

7

(R. 328). Dr. Lieberman noted that despite her claims of joint pain Nelson did not display "gait abnormalities" or notable physical responses during the evaluation. (R. 329). Dr. Lieberman gave Nelson a GAF score of 60 and cited "coping with symptoms of Post-traumatic stress, and reported physical pain; non-compliance with psychiatric treatment." (R. 329).

Based on his review of Dr. Lieberman's report and Nelson's medical records, Dr. Charles Warrender, a non-examining state agency psychological consultant, completed on February 20, 2008, a case analysis and a psychiatric review technique form ("PRTF"). He completed the PRTF noting non-severe impairments based on the categories of affective disorder, anxiety-related disorder, and substance addiction disorder. (R. 334). He found only a mild functional limitation on concentration, persistence or pace. (R. 344). In his consultant notes, Dr. Warrender observed that Nelson added depression as an impairment on her request for reconsideration and that she currently was not receiving treatment for it. (R. 346). Dr. Warrender discounted Dr. Lieberman's diagnosis of post-traumatic stress disorder as not supported by Nelson's symptoms or daily living activities. Dr. Warrender also noted the KUMC records for August and December 2007 do not refer to depression or other signs of a severe mental impairment. *Id.*

On July 18, 2008, Nelson went to KUMC asking for her disability paperwork to be completed and for a referral to physical therapy. (R. 422).

8

Apparently her treating physician, Dr. Fitzgibbons, was not available, as she was seen by Dr. Zufer and Dr. Kennedy. The mental status exam showed poor insight and judgment but no depression, anxiety or agitation. (R. 423). The musculoskeletal examination did not include any findings to preclude exercise testing or participation in an exercise program. (R.423). Nelson was told that she would need to follow up with Dr. Fitzgibbons on the disability paperwork but that Dr. Zufer could set up physical therapy for her now. (R. 424). Nelson said she would address that later too. *Id.*

In August of 2008, Nelson saw Dr. Fitzgibbons with various complaints of "back pain, muscle cramps and muscle aches" but without "joint pain, joint swelling, presence of joint fluid, muscle weakness, stiffness, arthritis, gout, loss of strength." (R. 418). The examination showed normal gait and station and a notation that Nelson "can undergo exercise testing and/or participate in exercise program." (R. 419). Dr. Fitzgibbons observed "no depression, anxiety or agitation" but noted for the first time a diagnosis of fibromyalgia. (R. 419). There was also a recommendation to continue vocational rehabilitation "to overcome deconditioning." (R. 413).

In September of 2008, Nelson had a routine follow-up visit with Dr. Fitzgibbons noting multiple issues and presenting paperwork. Nelson said she was doing better with the medications but she complained of fatigue. The diagnosis of fibromyalgia was recorded along with the recommendation that

Nelson participate in vocational rehabilitation to work on endurance. (R. 410).

The musculoskeletal examination showed multiple "trigger points in neck,

back, arms and legs." (R. 412). Dr. Fitzgibbons observed no depression.

On September 26, 2008, Dr. Stanley Mintz, Ph. D., performed a

psychological examination of Nelson based on an SRS referral. (R. 530). Dr.

Mintz observed that Nelson did appear depressed. (R. 531). Testing showed

borderline verbal intellectual ability, low average perceptual motor intellectual

ability, and "a mediocre pattern of verbal and non-verbal abilities and

academic skills across all areas assessed." (R. 531-32). "Personality test

results and interview impressions are suggestive of depression," but she also

appeared "guarded at times evasive" and "somewhat ambivalent about

working" and about counseling and psychotherapy. (R. 532). Dr. Mintz opined

that Nelson appeared "capable of work placement from a psychological point of

view" but with a recommendation for mental health treatment. (R. 533).

On October 14, 2008, Nelson was seen at KUMC emergency room

for a bump developing under her breast. Jane Zaudke, M.D., saw Nelson, and

the notes from the visit show Nelson denying muscle aches and depression. (R.

405). Dr. Zaudke observed no depression. (R. 406). Nelson's follow-up

appointment for the skin abscess was in two weeks with Dr. Fitzgibbons. (R.

400. Notes from that visit show complaints of continuing "stiffness in back and

neck." *Id.* Dr. Fitzgibbon observed that there was "still a few trigger points in

10

neck (post) upper back." (R. 402). No depression was noted again. Dr.
Fitzgibbon described the plan of physical therapy "to work on strength and
endurance." (R. 403).

From August to December of 2008, Nelson participated in 14
physical therapy sessions but missed or canceled 8 more sessions. She was
discharged from physical therapy after not making any appointments after
December 5, 2008. (R. 399).

Dick Santner, MS, on referral by the SRS, completed a vocational
assessment on Nelson on November 7, 2008. He noted:

> There were no visual indications of pain or discomfort although she did
> verbally convey she was in pain when I interviewed her. She did indicate
> that both her CNA and medical assistant certifications have expired. As
> Ms. Nelson did not seem uncomfortable during the testing sessions
> themselves, I was somewhat surprised that she listed so many physical
> complaints and then seemed to walk back to the testing room in a more
> labored fashion than she exhibited when walking in.

(R. 527). Santner relied on Dr. Fitzgibbon's assessments of Nelson's mobility
and work tolerance limitations and concluded that the Nelson had employment
potential for sedentary level work. (R. 528).

Dr. Fitzgibbons completed two medical questionnaires for Kansas
Vocational Rehabilitation Services. One questionnaire appears to be dated
January 14, 2009, and states that Nelson suffers from chronic pain and
fibromyalgia. (R. 521). The handwritten notes indicate that Nelson is
emotionally stable, that she could work with a "work-hardening therapeutic

program," but that she was limited by "leg pain." (R. 521-22). The other questionnaire appears to have been received on March 4, 2009. (R. 519). It similarly contains Dr. Fitzgibbons' handwritten notes indicating Nelson was capable of maintaining employment with vocational and physical rehabilitation work strengthening. (R. 519).

In January of 2009, Laurie Krieg, a counselor with Kansas Rehabilitation Services, found Nelson eligible for services noting her need for a work hardening therapeutic program and "self-direction functional limitations." (R. 543). Krieg noted that Nelson presently "can only work 2-3 hrs/wk" and a work hardening program is needed to build up her stamina. (R. 544).

On March 11, 2009, Nelson returned to her treating physician asking for a renewal of the prescription for physical therapy that had stopped in December of 2008. (R. 395). Nelson said she had noticed from the therapy "some minor improvement" with her lumbar and cervical back pain. *Id.* Dr. Fitzgibbon prescribed a muscle relaxant and more physical therapy. It was also noted that Nelson showed a "flat affect," responded "minimally to questions," and displayed poor insight. (R. 397).

On March 30, 2009, Nelson underwent a functional capacity evaluation at the referral of Dr. Fitzgibbon. (R. 391). The evaluation was performed by the occupational therapist, Nancy Lawrence, OTR, at KUMC. (R.

394). It was reported that Nelson participated in the one and one-half hour evaluation period and "was up on her feet for the majority of the time completing physical testing tasks." (R. 393). Based on the results of that evaluation, Lawrence commented, "Nelson is able to complete work at a light level" with a recommendation for alternating sitting and standing. (R. 394). Lawrence also commented that Nelson "reported stiffness and tingling of the right knee to the foot" and she increased her pain assessment to "7/10." *Id.*

In September of 2009, Nelson was seen by Dr. Fitzgibbon for a "well woman visit" with a discussion of multiple issues. (R. 382). Dr. Fitzgibbon recorded that Nelson had been prescribed Cymbalta for depression and was "currently working toward becoming employed again." *Id.* Nelson complained of stiffness, numbness and tingling. (R. 384). Dr. Fitzgibbon recorded normal gait, normal ranges of motion, and strength. It was also noted that judgment was "intact" and "no depression, anxiety or agitation." (R. 386).

Notes from a follow-up visit in October of 2009 mention back shoulder pain and back and hip stiffness. (R. 375). Dr. Fitzgibbons understood that Nelson was presently attending Johnson County Community college and listed Nelson's occupation as a nursing student. *Id.* Nelson's mental status was observed as "intact" judgment and "no depression, anxiety or agitation." (R. 377). Dr. Fitzgibbons added prescriptions of medication, orthopedic shoes and water aerobics for back and muscle problems. *Id.*

In December of 2009, Nelson returned for a follow-up on her chronic pain issues and to have paperwork completed regarding her medical condition and disability for SRS case manager. (R. 369). Dr. Fitzgibbons noted nothing unusual in musculoskeletal, neurologic or mental status examinations. (R. 371). Specifically, the notes again state "intact" judgment and "no depression." *Id*. Dr. Fitzgibbon referred Nelson to "Rehab medicine to determine ability to return to work." (R. 372).

A large part of this appeal deals with the treatment and opinions of Burton Deming, Ph. D., Johnson County Mental Health Center. Nelson began seeing Dr. Deming on February 16, 2009, with a diagnosis of a depressive disorder and an anxiety disorder and a GAF score of 53. (R. 472). On March 10, 2009, Dr. Deming's progress notes show Nelson "seemed more guarded and down from previous session" and her impairment to be moderate. (R. 469). Nelson expressed being open to trying medication again but the notes do not reflect that any were prescribed at that time.

Deming saw Nelson on March 24, 2009, noting that they were completing a questionnaire for vocational rehabilitation and that they discussed her feelings of being upset and depressed about being the sole parent. (R. 469). The medical questionnaire completed by Deming indicates a "good" prognosis for Nelson and a scheduled appointment to assess the need for medication. (R. 517). Deming wrote that Nelson "is able to put aside issue

14

and concentrate on working" and "is emotionally capable of maintaining work" assuming transportation and child care. (R. 517). Deming answered that Nelson had no emotional limitations or restrictions to working and that she was released to return to work "in terms of emotional adjustment." (R. 518). On April 21, 2009, Dr. Deming discussed his opinion with Nelson that "[s]he struggles with depression and anxiety but can manage these emotions without interfering with work." (R. 465). Nelson agreed with the information that Deming had included on the medical questionnaire.

On May 5, 2009, Nelson complained to Deming about "mood swings, anger, depression" and appeared upset and tearful during the session. (R. 463). Deming scored Nelson's impairment as "severe" and included these comments about Nelson:   "[i]s planning to call about conclusion on her readiness to work. Has not heard about SS disability yet. Beginning to think this is best for her." (R. 463).

Nelson canceled her appointment on June 2nd and was seen by Deming on June 16th. Deming scored Nelson's impairment as "moderate," and Nelson reported that the medication was "helping some with the depression and the pain." (R. 460). Deming recorded that he "[t]alked about what to say about being disabled, indicated need to make tentative statements about this." *Id.* In a letter dated June 17, 2009, addressed to Gene Sheets with "Social and Rehabilitation Services," Deming wrote that medication had helped Nelson and

15

that she was continuing to receive it and individual therapy. Deming also

discussed his diagnosis and some of Nelson's thought patterns. He wrote:

> The treatment and therapy is directed toward reconciling these conflicts. Tanisha is working at this because she wants to be a good mother and to be okay herself. Tanisha wants to work but it is difficult to assess how she would function in a work setting. The emotional difficulties with depression and anxiety are factors in themselves that impact on work success. In addition the emotional aspects are tied in with Tanisha's physical problems in that the pain from the Fibromyalgia can bring on the depression.

(R. 359).

On July 7, 2009, Deming discussed medications and learning to

accommodate her body with its illnesses. He recorded a "moderate"

impairment and that Nelson was "[m]uch less depressed this session."   (R.

458). Nelson cancelled or missed several appointments and returned on

September 18, 2009, with a disability form for evaluating mental functional

capacity. (R. 453). Nelson observed that she was not as depressed, that

depression is "less of a problem," and that she "might be able to work" except

for her physical problems. *Id.* Nelson also stated that her physical problems

aggravated her depression so as to become debilitating. *Id.*

Dated September 29, 2009, the mental residual functional

capacity assessment completed by Dr. Deming described Nelson as extremely

limited in her ability to maintain regular attendance and complete a workday

and as markedly limited in ability to remember work procedures, to remember

and carry out detailed instructions, to concentrate for extended periods, to

16

work with or near others, to accept supervision, to get along with co-workers, to respond appropriately to changes, to use public transportation, and to set realistic goals. (R. 361-62). Deming stated a diagnosis of depression and anxiety reactions that included fatigue, stress, low energy and attention and concentration difficulties. (R. 362). He opined that Nelson's emotional and mental condition disabled her from work and that these limitations began her initial visit to him. *Id*.

Nelson canceled her appointment on October 13th for insurance reasons. (R. 452). At her appointment on October 27, 2009, Nelson discussed with Deming her frustration with her KUMC treating physician's refusal to complete paperwork in support of disability. (R. 450). Deming noted Nelson's impairment as "moderate." *Id*. On November 12, 2009, Nelson complained again of her treating physician's refusal to send letter "say[ing] she is disabled," and Deming noted that Nelson had made "some strong comments" to her physician. (R. 448). Deming recorded that Nelson "felt good about letter to Voc Rehab" that Deming apparently was writing. *Id*. A letter dated November 25, 2009, from Deming to Ms. Krieg, counselor at Kansas Rehabilitation Services, states that Nelson has been "very consistent in keeping scheduled appointments" and that while the medication has helped Nelson and her depression and anxiety has lessened, the connection between physical problems and her depression would make full-time employment

difficult. (R. 365).

At her next visit, scheduled one month later, Nelson continued to complain of KUMC treating physician's unwillingness to say she's disabled. (R. 446). Deming recorded Nelson's impairment as "moderate" and noted that she did not seem "to be experiencing any problems with depression, stable in this regard." *Id*. Nelson's affect was appropriate, and there was no observed impairment with her cognitive process. *Id*. From Nelson's visit on January 12, 2010, Deming recorded Nelson's ongoing frustration with her treating physician and her own feelings that it "is too much to do physical therapy and try to work." (R. 443).

Nelson visited Deming on February 2, 2010, again expressing complaints with her situation at the KUMC and the "confusing messages" about her ability to work received from it. (R. 441). Nelson then missed several appointments and expressed that she did "not really want to come." (R. 437). She returned on March 23, 2010, appeared "more depressed," and reported that she had stopped the medication. (R. 435). Deming noted that most of the session was spent competing a disability form for her attorney.

Dr. Deming and Dr. Kuldeep Singh M.D. completed and signed and a mental impairment questionnaire dated April 1, 2010. (R. 496-499). They scored Nelson's GAF at 53 and noted moderate limitations on daily living, social functioning and concentration with no episodes of deterioration. (R. 496-497).

18

They indicated, however, that her symptoms were severe enough to interfere frequently with her attention and concentration for simple work tasks. (R. 498). They noted that Nelson would likely miss more than four days per month because of her impairment and that she could not work on a "sustained basis." (R. 498-499). They also noted that their answers applied to Nelson's emotional capacity as of February 16, 2009. (R. 499).

The plaintiff testified her physical problems were pain in her right foot due to a car accident and pain in back and throughout her body due to fibromyalgia. Her pain level at the hearing was five, and she described this pain level as a good day which she has a couple times each week depending on the weather and her activities. She has more days that are bad than good in a week. She cannot walk a block and can stand for 45 minutes to one hour. She cannot sit more 20 to 30 minutes. She described her mental problems as depression and mood swings.

**ERROR IN GIVING "LITTLE WEIGHT" TO OPINION OF TREATING PSYCHOLOGIST, DR. DEMING.**

"Under the 'treating physician rule,' the Commissioner will generally give greater weight to the opinions of sources of information who have treated the claimant than of those who have not." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (citation omitted). In evaluating a treating physician's opinion, the ALJ's initial step is to "consider whether the opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is consistent with the other substantial evidence in the record." *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). If the opinion meets this step, then it "must be given controlling weight." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). If it is fails this standard, then the opinion is not entitled to controlling weight. *Id.* "But even if he determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight." *Pisciotta*, 500 F.3d at 1077. Factors relevant in weighing that opinion include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* (citation omitted). The ALJ need not discuss each factor explicitly, and it is enough if the ALJ's decision is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight" and the decision provides "good reasons . . . for the weight" given. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir.2007) (citations and internal quotation marks omitted). The court reviews "the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence." *Krauser v. Astrue*,

20

638 F.3d 1324, 1326 (10th Cir. 2011).

       In her decision, ALJ gave "little weight" to Dr. Deming's opinion because it was inconsistent with the medical evidence of record and with some of Nelson's own admissions and because an opinion on the ultimate determination of disability is reserved for the Commissioner. (R. 18). The ALJ's decision makes other references to evidence from Dr. Deming. It cites Deming's intake evaluation of February 16, 2009, that started a treating relationship because Nelson wanted Vocational Rehabilitation to help her get a job. (R. 17). The ALJ's decision refers to Deming's progress notes from the visit on May 5, 2009, and the reported and exhibited symptoms of mood swings, anger and depression. The ALJ summarized the Deming's opinion in September of 2009 that Nelson was markedly impaired and had received treatment since February 16. The ALJ noted that Deming's opinion was that Nelson was disabled as of February 16, and this would continue for 12 months. (R. 17).

       The ALJ rightly observed "that a treating physician's opinion is not dispositive on the ultimate issue of disability." *White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2002) (citation omitted). The court is satisfied that the record contains substantial evidence supporting the ALJ's finding that Dr. Deming's opinion on Nelson being markedly impaired is inconsistent with the medical evidence of record. Most notably, Deming's own treatment notes do

21

not support his opinion. Nelson told Deming that Vocational Rehabilitation was requiring her to receive treatment for depression and anxiety before it would work with her. (R. 471). So after the intake evaluation in February and one therapy session on March 10, Deming completes with Nelson the questionnaire for Vocational Rehabilitation on March 24. As summarized above, Deming opined that Nelson's prognosis was good, that she was able to concentrate, that she had no emotional limitations or restrictions on working, and that she was released to work "in terms of emotional adjustment. (R. 517-18). Approximately one month later, April 21, 2009, Deming writes in his progress notes that Nelson struggles with depression but "can manage these emotions without interfering with work." (R. 465). So from February 16, 2009, through April 21, 2009, Deming's recorded opinion is that Nelson does not suffer from any emotional limitation to work.

Following the therapy session on May 5, 2009, Deming's opinion on Nelson's emotional limitations appears to change significantly. This is one of the visits highlighted in the ALJ's decisions. The progress notes from this session are the only time that Deming noted a "serious" impairment. He also recorded for this session that "[b]eginning to think this ["SS disability"] is best for her." (R. 463). But in June, Deming reduces the impairment rating to "moderate" and notes improvement due to the medication. In July, Deming again rates a moderate impairment and notes "much less depressed." (R.

458). Nelson then apparently misses all of her therapy appointments but returns in September with a disability form that she wants Deming to fill out. Despite his opinion as of April that Nelson had no emotional restrictions on her work, despite Nelson's two months of improvement from her May visit, and despite Nelson's missed appointments from July 23 until her return on September 18, Deming inexplicably assessed Nelson's mental residual functional capacity as markedly limited in many areas. (R. 361-362). *See White v. Barnhart*, 287 F.3d at 907-08 (the physician's change in assessment is not explained by any apparent change in the claimant). Deming made this assessment even though his last treatment of Nelson on July 7 indicated she was "much less depressed" and though his treatment notes from his most recent visit on September 18 indicated only a moderate impairment.

It is also important to consider that Deming's progress notes from December 15, 2009, state that he was writing to Nelson's case worker at vocational rehabilitation a letter that recommended she was disabled and could not work full time. But at the same time, Deming was recording in his progress notes that Nelson did not seem "to be experiencing any problems with depression, stable in this regard," that her affect was appropriate, and that she had no observed impairment with the cognitive process but that her mood was anxious. (R. 446). Deming's earlier reports and his progress notes are not consistent with his opinion that Nelson was markedly impaired. These

same inconsistencies in Deming's notes and reports certainly justify the reduced weight given Deming's opinion by the ALJ. *See Pisciotta v. Astrue*, 500 F.3d at 1078 ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." (internal quotation marks and citations omitted). While Nelson is critical of the ALJ's failure to discuss specifically each of the six credibility factors, the court is satisfied by the ALJ's citation of Deming's conflicting reports and progress notes as examples to explain his reasoning for the reduced weight given Deming's opinion. The ALJ cited several instances of inconsistencies and conflicts between Dr. Deming's progress notes and his September 2009 opinion of marked limitations. (R. 17-18). The ALJ took note of Deming's later records indicating not only that Nelson had improved but also that she had the ability to work part time. The ALJ also observed that in his source statement of 2010 Deming indicated only moderate restrictions with a fair to good prognosis. "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). Here the ALJ stated that he carefully considered all of the evidence. (R. 10, 14, 15). *See Wall v. Astrue*, 561 F.3d at 1070 (noting well-established principle of taking ALJ at his word when he indicates he considered all of the evidence).

Dr. Deming's opinion is also inconsistent with the medical evidence

24

available in Nelson's treatment records at KUMC where she was seen for various medical conditions and treated by several different physicians but most frequently by Dr. Fitzgibbons, her treating general physician. In January of 2009, Dr. Fitzgibbon commented on the medical questionnaire that Nelson was "emotionally stable." (R. 521). As summarized above, the KUMC physicians did not record any observed depression in Nelson except for her visit on March 11, 2009. (R. 397). Dr. Fitzgibbon recorded no observed depression or anxiety in September, October and December of 2009.

Dr. Deming's opinion on the severity of Nelson's mental limitations is not consistent with the February 2008 opinion of Lynn Lieberman, Ph. D., who performed a consulting examination and cognitive testing finding only moderate symptoms and expressing some reservation about Nelson's employability based on her anger, irritability, and possible post-traumatic stress disorder. (R. 328-329). Deming's opinion is not consistent with Dr. Mintz, who did a psychological evaluation and testing in September of 2008 and concluded that Nelson appeared "somewhat ambivalent about working" and "capable of work placement from a psychological point of view." (R. 532-533). Finally, Dr. Deming's opinion is not consistent with Dr. Warrender who in February of 2008 found only non-severe mental impairments.

Substantial evidence also exists to support the ALJ's finding that Dr. Deming's opinion on the severity of Nelson's mental impairment is

inconsistent with some of Nelson's own admissions. Deming's own progress notes point out:

> Difficulty completing the form (disability form) because it is for mental functional capacity. Notes that her depression is less of a problem and if she did not have physical problems and pain she might be able to work full time. However the depression is aggravated by the physical problems and becomes debilitating.

(R. 453). While finding marked limitations in Nelson's ability to carry out detailed instructions, to concentrate for extended periods, to work with others and to accept supervision, Nelson's statements in her function reports plainly contradict such limitations. (R. 141-142, 172-173).

The ALJ certainly could have discussed more of the relevant factors in weighing Dr. Deming's opinion. Nonetheless, the court does not believe that this prevents this court from making a meaningful review of the ALJ's decision. *Oldham*, 509 F.3d at 1258. This case is not an instance where the ALJ wholly failed to give any specific reasons for weighing Dr. Deming's opinion or failed to discuss any supporting rationale for those reasons. The court finds that the ALJ's decision offers apparent reasons that afford a legitimate basis for providing limited weight to Dr. Deming's opinion and that these reasons are supported by substantial evidence in the record.[1]

---

[1] The Commissioner's brief singles out other points from the evidence of record and applies them to other relevant factors that would support the ALJ's decision. The court cannot find those factors and reasons in the ALJ's decision, so the court shall disregard that discussion as improper post-hoc rationalization. *See Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005).

## ERROR IN FAILING TO FIND BORDERLINE IQ AND FIBROMYALGIA TO BE SEVERE IMPAIRMENTS

At step two, the ALJ did not list as severe impairments Nelson's fibromyalgia and her borderline intellectual functioning. Pointing to the evidence showing both to be severe impairments, the plaintiff then concludes that the ALJ erred in not considering these as severe impairments and necessarily failed to consider the effects of those impairments in combination with her other identified impairments. Assuming then that the ALJ has not considered the effects from all her impairments, the plaintiff contends the ALJ's decision does not rest on substantial evidence.

The ALJ's failure to list all severe impairments is not necessarily reversible error. In *Brescia v. Astrue*, 287 Fed. Appx. 626, 628–629 (10th Cir. July 8, 2008), the claimant argued that the ALJ improperly determined that several of her impairments did not qualify as severe impairments. The appellate court said it was not reversible error if the ALJ found at least one severe impairment, because the regulations then took the combined effect of all of the claimant's impairments and required their consideration without regard to whether each individual impairment met the severity threshold. It is not reversible error for the ALJ to omit additional severe impairments at step two, so long as the ALJ determines the claimant's RFC considering the effects of all the claimant's medically determinable impairments, severe or not. *See Hill v. Astrue*, 289 Fed. Appx. 289, 291–292 (10th Cir. Aug. 12, 2008) (ALJ's

27

failure to find additional severe impairments is not a ground for reversal by itself, for the ALJ may determine the claimant's RFC considering "the effect of *all* of the claimant's medically determinable impairments, both those he deems 'severe' and those 'not severe.')

In making the RFC findings, the ALJ stated that she had carefully considered "the entire record" and "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p." (R. 14). The ALJ noted that the opinion evidence was considered consistent with the applicable regulation and social security rulings. (R. 14). The ALJ further acknowledged the applicable two-step process of first determining whether there is a medically determinable physical or mental impairment that could reasonably be expected to produce claimant's pain or symptoms, and second evaluating the claimant's symptoms to determine the extent they limit the claimant's functioning. (R. 14-15).

The ALJ expressly discussed the results of Dr. Mintz's psychological evaluation and testing and his diagnosis of "depressive disorder, mood disorder, and borderline intellectual function." (R. 14). The ALJ stated that she afforded probative weight to Dr. Mintz's opinion that included his assessment of the plaintiff being capable of work placement. (R. 14). The ALJ's

RFC finding included "simple, unskilled work with a SVP of 1 or 2. (R. 14).

"Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled

work corresponds to an SVP of 1-2." Social Security Ruling ("SSR") 00-4p,

2000 WL 1898704 at *3 (2000). This is "work which needs little or no

judgment to do simple duties that can be learned on the job in a short period

of time." 20 C.F.R. § 404.1568(a). The SVP limitation set by the ALJ accounts

for the borderline intellectual functioning, and none of the related testing

results shows the plaintiff to lack the skills necessary to perform the identified

past relevant work or the other light work described in the vocational expert's

testimony. *Cf. Wendelin v. Astrue,* 366 Fed. Appx. 899, 2010 WL 582639 at *3

(10th Cir. 2010).

The ALJ expressly discussed Nelson's diagnosed impairment of

fibromyalgia, Nelson's testimony about pain and symptoms related to

fibromyalgia, evidence that the physician treating Nelson for fibromyalgia was

unwilling to opine that Nelson was disabled, and evidence of a functional

capacity evaluation done in March of 2009 at her treating physician's direction

that found her able to work at the light level. The ALJ also noted that the

plaintiff's alleged symptoms from this impairment were not credible based on

her failure to follow through with the prescribed physical therapy, her

infrequent visits to her treating physician for this condition, and the

observations of her Vocational Rehabilitation Services worker that Nelson did

not seem motivated to work or to improve her circumstances. The ALJ

discounted the plaintiff's credibility on the disabling symptoms from the

fibromyalgia and afforded significant weight to the functional capacity

evaluation done in March of 2009. The ALJ's RFC of light work with functional

limitations shows that the impairment of fibromyalgia and related symptoms

were accounted for in the RFC. The court does not find reversible error on this

issue.

## ERROR IN NOT INCLUDING ANY CONSEQUENCES TO RFC FROM MODERATE DIFFICULTIES WITH CONCENTRATION, PERSISTENCE OR PACE

The plaintiff contends the RFC restriction to simple, unskilled work

is insufficient to account for this mental deficit in concentration, persistence

and pace.   The ALJ's finding on this deficit states:

With regard to concentration, persistence or pace, the claimant has moderate
difficulties. She testified that she reads history and medical publications, but
not daily unless she has a new book. She mostly watches television news
programs and occasional movies for four hours per day. She sometimes has
problems with her memory, needing to make notes. Her hobby is writing. She
stated that her concentration is okay, but she has trouble concentrating if she
has something else on her mind. She is enrolled in vocational rehabilitation,
but they want her to be treated for physical and mental impairments before
continuing. Examining consultative psychologist Dr. Lieberman considered the
claimant's concentration and attention adequate.

(R. 13). In laying out the evidence in support of this finding, the ALJ certainly

credited the plaintiff's testimony insofar as having memory issues that may

require taking notes and concentration troubles when distracted by other

concerns. The ALJ, in citing Dr. Lieberman's opinion, certainly found that

neither deficit would prevent Nelson from performing simple employment. Such a finding is consistent with the vocational evaluation performed by Santer2 to which the ALJ gave "significant weight" and the opinion of Dr. Mintz to which the ALJ gave "probative weight." (R. 16). This finding when placed within its proper context is consistent with the ALJ's limitation to simple, unskilled jobs and a SVP of one or two. The hypothetical question crafted by ALJ certainly accounts for the particular mental limitations to memory and concentration that are described in the ALJ's decision and sustained by the evidence cited in it. *See Wendelin v. Astrue*, 366 Fed. Appx. at 904. The ALJ did not credit any other findings of additional limitations in persistence, need for supervision or pace that would need to be included in the hypothetical question. The court is satisfied that the ALJ's RFC and hypothetical questions to the vocational expert properly accounted for the Nelson's difficulty with memory and concentration.

IT IS THEREFORE ORDERED that judgment be entered in accordance with the fourth sentence of 42 U.S.C. § 405 (g) affirming the Commissioner's decision.

Dated this 20th day of February, 2013, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

---

2 Santer found: "Ms. Nelson should not have any difficulty independently starting tasks, finishing tasks, doing all of the steps in the task, following schedules or, deciding on what to do next." (R. 528)